## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 4192 ACUSHNET AVENUE, NEW BEDFORD, MASSACHUSETTS<br><br>IN THE MATTER OF THE SEARCH OF 254 AUSTIN STREET, APARTMENT #2, NEW BEDFORD, MASSACHUSETTS | Nos.<br>    21-mj-1116-DLC<br>    21-mj-1117-DLC<br><br><u>**FILED UNDER SEAL**</u> |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR SEARCH WARRANTS

I, Jerald Bettencourt III, being duly sworn, depose and state as follows:

### Introduction and Agent Background

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  I am a Task Force Officer ("TFO") with the United States Drug Enforcement Administration ("DEA") and have been so employed for approximately one year.

2.      I have been employed as a police officer by the Town of Fairhaven, Massachusetts since 2000.  I attended the Plymouth County Police Academy 34th MPOC, graduating in 2000. I have also been appointed and sworn as a deputy sheriff in both Bristol and Plymouth Counties. I am also a member of the South Eastern Massachusetts Law Enforcement Council's Detective Unit. This Unit operates under a mutual aid agreement with many other Massachusetts cities and towns, affording me conditional jurisdictional law enforcement authority within these areas.

1

3.      I hold a Bachelor's Degree in Criminal Justice from Western New England College. In addition to the annual in-service training I have attended, I have completed specialized training in: fingerprinting identification, detective basic training, street level narcotic training, domestic drug interdiction, detective legal training, interview and interrogation techniques, search warrants and NIK drug and ODV field testing Kits, as well as the U.S. Drug Enforcement Administration's Basic Narcotic School.

4.      During my career, I have conducted and participated in numerous narcotics-related investigations resulting in the arrest of persons for violating drug laws. These investigations have resulted in convictions for violations of the drug laws and other criminal offenses, the seizure of drugs, monies, firearms, real estate, and property, and the forfeiture of monies, real estate, and property.

5.      As a DEA TFO, I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I am familiar with the benefits and limitations of these techniques. I have also reviewed recorded conversations and telephone, financial, and drug records. I have also become familiar with the manner in which narcotics organizations use various forms of violence and intimidation in furtherance of their narcotics trafficking activity to protect their operations, members, narcotics, and narcotics proceeds.

6.      Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage and transportation of narcotics and the collection of money that constitutes the proceeds of narcotics trafficking activities.  Further, I

2

know that individuals who distribute narcotics often utilize cellular telephones, and the text

messaging capability included within their cellular telephones, as a method by which to arrange

narcotics transactions.  I also know that individuals involved in the distribution of controlled

substances frequently talk in code, either during conversations or while utilizing the text

messaging function within their cellular telephones, as a means by which to avoid detection and

apprehension by law enforcement.

### Purpose of the Affidavit

7.      As further described below, I believe that there is probable cause to believe that

Tyson RAPOZA, date of birth xx/xx/1989 ("RAPOZA") and others, known and unknown, have

committed, are committing, and will continue to commit violations of 21 U.S.C. § 841(a)(1)

(distribution and possession with intent to distribute a controlled substance), 21 U.S.C. § 843(b)

(use of a communication facility in the commission of controlled substances trafficking

offenses), and 21 U.S.C. § 846 (conspiracy to distribute and to possess with intent to distribute a

controlled substance) (the "Target Offenses").

8.      I submit this affidavit in support of a search warrant for 4192 Acushnet Avenue, New

Bedford, Massachusetts ("Target Location 1"), which is described in greater detail below and in

Attachment A.

9.      I also submit this affidavit in support of a search warrant for 254 Austin Street,

Apartment #2, New Bedford, Massachusetts ("Target Location 2"), which is  described in greater

detail below and in Attachment A-1.

10.     I am familiar with the facts and circumstances of this investigation from my own

personal participation and from oral and written reports given to me by other DEA agents and

employees, Task Force Officers, and local police departments. This affidavit is intended to

demonstrate that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

<u>Previous Warrant</u>

11.     On February 22, 2021, the Honorable Donald L. Cabell, United States Magistrate Judge, issued a search warrant . (the "February 22nd Warrant") authorizing investigators to search the premises at  4192 Acushnet Avenue, New Bedford, Massachusetts (See 21-MJ-1039). ("Target Location 1").  The affidavit filed on February 22, 2021 is attached and incorporated herein by reference.  The February 22nd Warrant has not been executed at Target Location 1.  As described further herein, after obtaining the February 22nd Warrant, agents identified Target Location 2.  As such, agents would like to execute warrants for both locations simultaneously.

**Probable Cause**

12.     In early February 2021 the DEA's New Bedford Resident Office began an investigation of RAPOZA, as a source of supply of suspected fentanyl in the New Bedford, Massachusetts area.  The investigation of RAPOZA led to the seizure of oxycodone and suspected fentanyl/oxycodone from a street-level buyer of fentanyl, who is now a Cooperating Source (hereinafter  the "CS").[1]

*Surveillance of Target Location 1*

13.     On February 3, 2021, agents assigned to the DEA's New Bedford Resident Office set up surveillance in the area of Target Location 1.  At 3:16 PM, RAPOZA was observed leaving Target Location 1 in an Audi registered in his name (the "RAPOZA Audi").

---

[1] As described further below, the CS seeks consideration toward sentencing on a charge that will be filed related to conduct described herein.

Investigators followed the vehicle as it traveled directly to Briarwood Drive, where RAPOZA pulled the vehicle to the curb.

14.     While conducting surveillance, agents observed behavior that, based on their training and experience, was consistent with a street-level sale of narcotics.  Specifically, at approximately 3:20 PM, a Honda Pilot bearing MA Registration 3CL763 parked near the RAPOZA Audi.   A white male, who was unidentified at the time, exited the driver's seat of the Honda Pilot and entered the passenger seat of the RAPOZA Audi.  Approximately one minute later, the same unidentified male exited the Audi, returned to the Honda Pilot, and departed the area. Investigators followed the Honda Pilot onto Route 140, and then Route 24 North, where the vehicle was temporarily lost because it was traveling at a high speed.  At approximately 3:40 PM, agents located the Honda Pilot at a Mobil Gas Station near the 24/495 interchange. An agent observed the unidentified white male at the pumps, putting gas into the Honda Pilot. The unidentified male was wearing a mask but did not appear to be the registered owner of the vehicle.  The Honda Pilot soon departed, and surveillance was later terminated.

15.     On February 11, 2021, agents again set up surveillance at Target Location 1.  At approximately 9:00 AM, agents observed RAPOZA leave Target Location 1 in a Ford Explorer (MA 2PRR31).[2]  Agents followed the Explorer to the area of 83 Blaze Street, which is located in a residential neighborhood across from the Dunkin Donuts located at 1169 Braley Avenue, New Bedford.

---

[2]The Explorer is registered in RAPOZA's name at Target Location 1.

16.     As RAPOZA drove past the Dunkin Donuts, agents observed an unknown female operating a blue Volkswagen (MA 9VF793) depart the Dunkin Donuts and cross Braley Road into the residential neighborhood.  Agents watched as the woman pulled directly behind RAPOZA's Explorer.  Agents then observed what, in their training and experience, was consistent with a street-level sale of narcotics.  Specifically, the unidentified female got out of her car, opened the passenger side door of RAPOZA's Explorer, reached into the vehicle, quickly shut the passenger side door of the Explorer, then immediately returned to her Volkswagen, and departed the area.

17.     After the brief interaction, agents followed the woman back to what appeared to be her residence.  Agents then returned to Target Location 1 to conduct further surveillance of RAPOZA.

18.     At 10:50 AM, an agent positioned at the Dunkin Donuts located at 1169 Braley Road observed the same 2007 Honda Pilot seen previously on February 3, 2021, pull into the Dunkin Donuts parking lot.  At approximately 10:52 AM, agents observed RAPOZA's Explorer leave Target Location 1, drive to the Dunkin Donuts located at 1169 Braley Road, and pull into the drive thru.

19.     Agents watched as the driver of the Honda Pilot exited his vehicle, approached, and then entered the passenger side of RAPOZA's Explorer. Approximately three minutes later, the male exited the Explorer, walked back to the Honda Pilot, and departed the area.

20.     Based on their training and experience, agents believed that they had observed the driver of the Pilot participate in a street-level purchase of narcotics.  After the Pilot left the area,

agents stopped the vehicle. The driver (hereinafter  the "CS") admitted to buying 50 pills inside the Explorer and expressed a willingness to cooperate.[3]

21.     The CS then surrendered 48 pills to agents.  The CS stated he had already consumed two of the 50 pills purchased.  The pills seized from the CS were not field tested. Agents, however, requested the DEA's Northeast laboratory to rush testing on one of the pills. The DEA laboratory has since confirmed that the pill tested contained oxycodone.

22.     On February 12, 2021, acting at the direction of agents, the CS phoned RAPOZA and requested to purchase 10 pills.  The conversation was overheard by agents.  Once the meet location was determined, agents searched the CS as well as the CS's vehicle for money or weapons with negative results.  The CS was then provided pre-serialized Official Authorized Funds (OAF) with which to make the purchase and equipped with an audio and video recording device.

23.     At 2:18 PM, agents observed RAPOZA arrive at Target Location 1 in his Ford Explorer.  RAPOZA exited the Explorer and entered the residence.  Minutes later, at approximately 2:21 PM, agents observed RAPOZA exit Target Location 1 and enter the Explorer. RAPOZA then backed out of the driveway and proceeded to drive south on Acushnet Avenue. Surveillance followed RAPOZA as he drove directly to the same Dunkin Donuts where he had met the CS the day before.

---

[3] The CS, who seeks consideration toward sentencing on a charge that will be filed related to conduct described herein, has no prior convictions, but has obtained a  number of dismissals over the course of several years on charges that include Larceny, Malicious Destruction of Property, Assault & Battery, and Assault.  Information provided by the CS as described herein is believed to be reliable because it was corroborated by agents.

24.     At approximately  2:22 PM, the CS received a call from RAPOZA.  During the
call, which the CS reported to investigators, RAPOZA stated that he (RAPOZA) wanted to meet
in the neighborhood across from Dunkin Donuts. At this time, agents observed the CS depart the
Dunkin Donuts and travel down Briarwood Drive (which is directly across from Dunkin Donuts)
into the neighborhood suggested by RAPOZA.

25.     At approximately 2:23 PM, agents, who maintained constant surveillance of
RAPOZA after he left Target Location 1, observed the Explorer turn onto Briarwood Drive.
Agents observed RAPOZA, who appeared to be looking for the CS, drive down side streets in
the neighborhood near the Dunkin Donuts.  At approximately 2:24 PM, agents observed
RAPOZA's Explorer and the CS's vehicle parked window to window on Cottonwood Road.
After stopping briefly, RAPOZA and the CS departed in their respective vehicles.

26.     At approximately 2:25 PM, RAPOZA was observed driving toward Target
Location 1.  At approximately 2:28 PM, agents observed RAPOZA's Explorer parked on
Brantwood Street near Target Location 1.

27.     Agents also followed the CS from the meeting with RAPOZA, directly to a secure
location.  At approximately 2:30 PM, the CS arrived at the secure location.  The CS then
immediately handed agents a knotted plastic bag containing 10 pills.  The pills, which were
different in color, were later separated based on color, creating two different exhibits.  Agents
searched CS, and the CS's vehicle, with negative results.

28.     Although the pills seized from the CS and purchased from RAPOZA were not
field tested, agents requested a rush analysis from the DEA laboratory and are awaiting results.
Based on the context of the events described herein, and training and experience, I believe the
pills are either illicitly obtained Oxycodone or counterfeit Oxycodone pills containing fentanyl.

*RAPOZA Uses Target Location 2*

29.     On the morning of February 22, 2021 agents set up surveillance in the area of Target Location 1 in anticipation of executing the February 22nd Warrant.  Over the course of several hours agents did not observe RAPOZA.  Nor did agents see either of his vehicles parked in the area.

30.     On a previous occasion, the CS had informed TFO Barbosa, that the CS had done construction work worked for RAPOZA at a property that he/she believed RAPOZA owned on Austin Street, in New Bedford.   At approximately 11:00 AM, TFO Barbosa located the RAPOZA Audi at Target Location 2.  At approximately 12:00 PM on February 23, 2021, agents contacted the CS to inquire further about Target Location 2.  During the conversation, the CS told agents that for approximately one month, between November 2020 and December 2020, he/she had worked as a contractor renovating the first floor apartment in the same building as Target Location 2.  During that time, the CS saw RAPOZA on several occasions entering and leaving Target Location 2.  On one occasion RAPOZA invited the CS inside the second floor apartment.  RAPOZA told the CS that  he was going to remodel the second floor.   While working in the first floor apartment, the CS observed RAPOZA arrive and depart from Target Location 2 utilizing both of his known vehicles.[4]

---

[4] As described below, the CS's statement that RAPOZA spent time at Austin Street was corroborated by surveillance.  However, the building is actually owned by a woman believed to be RAPOZA's cousin (Tamica Deandrade).

*RAPOZA Sells More Narcotics to the CS*

31.     I know from my training and experience that it is common for drug distributors to keep drugs and/or drug proceeds at multiple locations.  I know that using multiple locations/residences, sometimes called "stash houses," has certain advantages for drug distributors including, (a) to protect the identity of the drug distributor during drug transactions, (b) to protect a larger store of drugs, and (c) to protect and store cash and other proceeds earned from the distribution of illicit narcotics.

32.     On Tuesday February 23, 2021, at approximately 7:30 PM, I did a spot check Target Location 2.  Upon arrival to the residence, the RAPOZA Audi was parked in the driveway. The lights were illuminated throughout the second floor. The first floor apartment, which appeared unoccupied, was in complete darkness with no window blinds or shades on the windows.

33.     On February 24, 2021, at 11:52 AM, acting at the direction of agents, the CS sent a text to RAPOZA.  The text stated,  "Sup."  At approximately 11:57 AM, in the presence of agents, the CS placed a call to RAPOZA.  During the call, the CS asked RAPOZA if he could meet the CS in 25 minutes.  After RAPOZA agreed to meet, the CS asked RAPOZA for  "25," meaning 25 pills.  At approximately 12:24 PM, the CS texted RAPOZA that he/she was 10 minutes away. RAPOZA responded by text, telling the CS to meet at "Exit 3."  From previous drug sales with RAPOZA, the CS understood that RAPOZA wanted to meet at a specific location near Hathaway Road in New Bedford.

34.     Once the meet location was determined, agents searched the CS as well as the CS's vehicle for money or weapons with negative results.  The CS was then provided $825 of

pre-serialized Official Authorized Funds (OAF). Agents also equipped the CS with an audio and video recording device.

35. At approximately 12:29 PM, an agent conducting surveillance at Target Location 2 witnessed RAPOZA back the RAPOZA Audi out of the driveway of Target Location 2. Agents maintained constant surveillance of RAPOZA as he drove from Target Location 2 to a nearby Dunkin Donuts drive thru, then to the meet location on Hathaway Road.

36. At approximately 12:35 PM, the CS departed the secure location and traveled directly to the neighborhood near Yesteryear Cycles, followed closely by surveillance agents. At approximately 12:38 PM the CS met RAPOZA on a side street in the same neighborhood. The CS parked behind RAPOZA's Audi, exited his vehicle, and got into the front passenger seat of RAPOZA's car. Less than two minutes later, the CS exited the RAPOZA Audi, returned to the CS vehicle, and departed the area.

37. After RAPOZA and the CS separated, agents attempted to follow RAPOZA, but briefly lost sight of the vehicle when RAPOZA began driving aggressively. At approximately 12:40 PM, RAPOZA was spotted driving on Upton Street headed toward the Target Location 2. Agents again lost sight of RAPOZA until approximately 12:46 PM, when RAPOZA was observed pulling into the driveway at Target Location 2. Shortly thereafter, surveillance was terminated.

38. Meanwhile, agents followed the CS from the meeting with RAPOZA directly to a secure location. At approximately 12:50 PM, the CS arrived at the secure location. The CS then immediately handed agents a knotted plastic bag containing a mix of blue, yellow, and white pills. Agents searched the CS and the CS's vehicle for currency or contraband, with negative

11

results.  Thereafter, agents field tested a sample of each color of pill, each of which tested positive for the presence of Oxycodone.

*RAPOZA Continues to Use Both Target Locations to Deal Drugs*

39.     At approximately 8:16 AM on March 2, 2021, I observed the RAPOZA Audi, driven by RAPOZA, back out of the driveway at Target Location 1 and drive directly to 966 Brantwood Street.  RAPOZA's small child was with him in the car.

40.     Three minutes later, at approximately 8:19 AM, an agent conducting surveillance observed the RAPOZA Audi, driven by RAPOZA, exit Brentwood Street alone, without the child, and drive directly to the Dunkin Donuts located at 1169 Braley Road, New Bedford.  At approximately 8:29 AM, I observed a female operating a blue Volkswagen (MA 9VF793) drive from the Dunkin Donuts, across Braley Road, onto Briarwood Street.  Agents recognized the driver of the Volkswagen as the same person that agents believe in their training and experience, was observed participating in a hand to hand street level narcotics deal with RAPOZA on February 11, 2021.

41.     At approximately 8:30 AM, I observed the RAPOZA Audi, driven by RAPOZA, exit the Dunkin Donuts, and cross Braley Road onto Briarwood Street.  RAPOZA was driving slowly and, in my training and experience, appeared to be looking for the blue Volkswagen. Three minutes later, at approximately 8:33 AM, an agent conducting surveillance observed the Volkswagen pull onto Braley Road and depart the area.  At approximately 8:34 AM, one minute after the Volkswagen was observed leaving the area, I observed the RAPOZA Audi exit the same neighborhood onto Braley Road.  Agents conducting surveillance followed RAPOZA directly back to Target Location 2.

42.     While agents did not directly observe a meeting between the driver of the blue Volkswagen and RAPOZA, I believe, based upon my training and experience, as well as my

observations and those of other agents on February 11, 2021, that on March 2, 2021, RAPOZA

and the driver of the blue Volkswagen were at least attempting to complete another drug sale.

43.     Since conducting the controlled buy on February 24, 2021, agents have conducted

additional surveillance of both target locations.  Agent observations have included what are

believed to be overnight stays[5]  by RAPOZA at either Target Location 1 or Target Location 2:

   a      On February 23, 2021, RAPOZA stayed overnight at Target Location 2.

   b      On February 24, 2021, RAPOZA stayed overnight at Target Location 2.

   c      On February 25, 2021, RAPOZA stayed overnight at Target Location 1.

   d      On February 26, 2021, RAPOZA stayed overnight at Target Location 2.

   e      On February 27, 2021, RAPOZA stayed overnight at Target Location 1.

   f      On February 28, 2021, RAPOZA stayed overnight at Target Location 1.

44.     In addition to using both Target Location 1 and Target Location 2 as residences,

as described above, RAPOZA has been observed traveling directly from both Target Location 1

and Target Location 2 to distribute oxycodone and/or suspected narcotics.  Specifically, on

February 11, 2021, RAPOZA exited Target Location 1 and, based on agent training and

experience, participated in the street level sale of suspected narcotics to the driver of the blue

Volkswagen.  Immediately thereafter RAPOZA distributed 50 oxycodone pills to the CS.

Likewise, on February 24, 2021, RAPOZA exited Target Location 2, made a brief stop at a

Dunkin Donuts, then distributed Oxycodone to the CS.  Finally, on March 2, 2021, RAPOZA

_____

[5] By "overnight," I mean that RAPOZA's vehicles were parked in the same location all night.  In addition, agents observed RAPOZA leave the respective address described below, in the early morning hours of February 23-26th.

13

exited Target Location 1 and participated in what agents suspect, based on their training and experience, was a hand to hand sale of narcotics with the driver of the blue Volkswagen. Following the suspected drug deal, RAPOZA did not immediately return to Target Location 1, but drove to Target Location 2 instead.

45.     With the assistance of the CS, physical surveillance, and analysis of phone records, agents believe that RAPOZA has committed and is committing the Target Offenses. Based on the foregoing, and on my training and experience, I believe that RAPOZA is using both Target Locations to commit the Target Offenses.

*Drug Traffickers' Use of Residences General*

46.     Based upon my training, experience, participation in other narcotics investigations, and extensive discussions with other law enforcement officers experienced in narcotics investigations, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia and records in their residences for longer periods of time than they keep drugs in their residences.  I have participated in the execution of numerous search warrants of the residences of drug traffickers whose criminal activity is similar to that of RAPOZA.  In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, drug related evidence has typically been recovered including cash, records, drugs, and other valuable items.  Based on this experience and my training, I believe that:

a.   Drug distributors often find it necessary to store large sums of cash received from the sale and distribution of controlled substances outside the normal banking system. Accordingly, narcotics traffickers frequently maintain large amounts of cash and other valuable assets at their residence in order to maintain and finance their ongoing business.

b.   Drug traffickers frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, emails, and other documents relating to the transportation,

14

ordering, sale and distribution of controlled substances and monetary instruments and other assets, and to debts and collections relating to monies owed or due for the distribution of controlled substances; and documents relating to the transportation of controlled substances, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts. Such documents may be maintained in paper or electronic form, and are generally maintained where the narcotics traffickers have ready access to them, including in cell phones and other electronic media capable of storing such information electronically, at locations such as their residences or other locations where they regularly conduct their drug business. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

c. It is common for drug dealers to secrete records of drug transactions in secure locations within their cell phones, computers, residences, businesses, and/or other locations and devices over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities.

d. It is common for significant drug traffickers to hide controlled substances, proceeds of drug sales (i.e., large amounts of currency, financial instruments, jewelry, safety deposit keys and deeds to real property), and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, documents indicating travel in interstate and foreign commerce, and evidence of financial transactions relating to obtaining, transferring, hiding or spending large sums of money made from controlled substance trafficking activities in secure locations within residences, businesses, or other locations over which they maintain dominion and control, for ready access and to conceal them from law enforcement authorities.

e. Drug traffickers commonly maintain electronic and paper books or documents which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization, and other contact or identification data relating to the distribution of controlled substances. Such records and items are maintained where the traffickers have ready access to them, commonly on the traffickers' cell phone(s). They also tend to

15

maintain for long periods of time telephone billing records that evidence the placing of large numbers of calls each month in connection with narcotics dealing.

f.    Drug traffickers commonly have photographs of themselves, their associates, their property and their products in their possession or in their residences, and frequently maintain these photographs on their cell phone(s) and other electronic devices.

g.    Drug traffickers frequently maintain the items described above inside safes, key-lock strong boxes, suitcases, safe-deposit boxes and other containers, which are further secured by combination and/or key locks of various kinds in order to hide the contraband from other individuals living at or in the vicinity of their residences.

h.    Drug traffickers frequently build "stash" places within their residences or other locations in order to store illicit drugs as well as the items described above.

i.    Residents, whether drug traffickers or not, typically keep items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

47.    Based upon all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth in this Affidavit, I believe that RAPOZA, like many drug dealers, uses two residences in furtherance of his ongoing drug-distribution activities, and that, among other things, documentary and other evidence regarding those activities, including, but not limited to: the items set forth in Attachment B will found inside of Target Location 1 and Target Location 2.  *See e.g.*, *United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999).[6]

---

[6]  In *Feliz*, the First Circuit made clear that, in the drug trafficking context, evidence of drug transactions can be expected to be found in a drug trafficker's residence for months after evidence of the last transaction. 182 F.3d at 87 ("[C]ourts have upheld determinations of probable cause in trafficking cases involving [three months long] or even longer periods") (citing *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991)(two year-old information relating to marijuana operation not stale)).  As the First Circuit has explained "[b]y its very nature, drug trafficking, if

*The Specific Target Locations*

48.     **Target Location 1**: 4192 Acushnet Avenue, New Bedford, Massachusetts. is described as a single family residence, light green in color with white trim with a front covered porch. Looking at the residence from Acushnet Avenue, the driveway is located to the right side of the residence and a white vinyl fence on the left side of the residence. The front door is white in color with two front porch lights on either side of the front door. The residence number, 4192 is located on the kick plate of the front door.  Target Location 2 is further described in Attachment A.

49.     **Target Location 2**:  254 Austin Street, Apartment #2, New Bedford, Massachusetts ("Target Location 2")  is described as a two family residence, tan in color with green shutters and white trim.  Looking at the residence from Austin Street, the driveway is located to the left side of the residence. The front door is accessed via a stairway with a white handrail, and the front door is located off of a covered porch.  The numbers "254" are marked at the top of the front door, which is green.  After entering the front door at 254 Austin Street, the first floor apartment door is located on the left.  The stairway leading to the second floor apartment is on the right.  Target Location 2 is further described in Attachment A-1.

Conclusion

50.     Based on the foregoing, I believe there is probable cause to believe that RAPOZA and others, known and unknown, have committed, are committing, and will continue to commit the Target Offenses.  Based upon the evidence set forth above, as well as my knowledge, training

---

unchecked, is apt to persist over relatively long periods of time."  *United States v. Nocella*, 849 F.2d 33, 40 (1st Cir. 1988).

and experience, I further submit that there is probable cause to believe that at Target Location 1 as described in Attachment A and at Target Location 2 as described in Attachment A-21, there exist evidence, fruits, and instrumentalities of RAPOZA's drug distribution activities as set forth in Attachment B.  Accordingly, I respectfully request that a search warrant be issued for the items set forth in Attachment B.

51.     Based on the foregoing, I request that the Court issue the proposed warrants, pursuant to Federal Rule of Criminal Procedure 41.

I declare that the foregoing is true and correct.



_____
JERALD BETTENCOURT III
TASK FORCE OFFICER
U.S. DRUG ENFORCEMENT ADMINISTRATION

Attested to in accordance with Fed. R. Crim. P. 4.1 by telephone this 8th day of March,   2021.

_____
HON. DONALD L. CABELL
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

18

**ATTACHMENT A**
(Description of the
Property to be searched)


4192 Acushnet Avenue, New Bedford, Massachusetts. is described as a single family residence, light green in color with white trim with a front covered porch. Looking at the residence from Acushnet Avenue, the driveway is located to the right side of the residence and a white vinyl fence on the left side of the residence. The front door is white in color with two front porch lights on either side of the front door. The residence number, 4192 is located on the kick plate of the front door.  See a picture of 4192 Acushnet Avenue, New Bedford immediately below



19

## ATTACHMENT A-1

(Description of the
Property to be searched)

41.     254 Austin Street, Apartment #2, New Bedford, Massachusetts ("Target Location 2")  is

described as a two family residence, tan in color with green shutters and white trim.  Looking at

the residence from Austin Street, the driveway is located to the left side of the residence. The

front door is accessed via a stairway with a white handrail, and the front door is located off of a

covered porch.  The numbers "254" are marked at the top of the front door, which is green.

After entering the front door at 254 Austin Street, the first floor apartment door is located on the

left.  The stairway leading to the second floor apartment is on the right.  See a picture of 254

Austin Street, New Bedford immediately below:



**ATTACHMENT B**
(Items to Be Seized)

1. Controlled substances.

2. Documents, dated or created from January 1, 2020 to present of purchases, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances used to manufacture controlled substances, electronic organizers, telephone bills, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and key.

3. Documents, dated or created from January 1, 2020 to present, and articles of personal property reflecting the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises to be searched or property therein, including containing data reflecting or memorializing the manufacturing, ordering, possession, purchase, storage, distribution, and/or transportation of controlled substances, including records of sales, records keys, rental agreements and records, property acquisition records, utility bills and receipts, photographs, recordings, telephones, vehicle records, canceled mail envelopes, correspondence, financial documents such as tax returns, bank records, safety deposit box records, canceled checks, and other records of income and expenditure, credit card records, travel documents, and personal identification documents.

4. Photographs and video and audio recordings which document an association with other coconspirators and/or which display controlled substances, firearms, or chemicals/materials used in the manufacturing of controlled substances.

5. Materials, equipment, and paraphernalia associated with the manufacturing, ordering, possession, purchase, storage, distribution, and/or transportation of controlled substances, including, but not limited to, packaging materials, storage bins, containers, cutting agents, and scales.

6. Items showing unexplained wealth or evidencing the proceeds derived from illicit drug trafficking, including but not limited to large sums of money, financial instruments, precious metals, jewelry, and real estate, and documents evidencing the procuring or leasing of these items.

7. Cell Phones identified as used by or belonging to Tyson Rapoza: From January 1, 2020 to present, all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing narcotics trafficking and/or referencing individuals engaged in narcotics trafficking, located in the memory of any mobile telephone belonging to or identified as being used by Tyson Rapoza and described as the mobile telephone's:

a.  Incoming call history;

b.  Outgoing call history;

c.  Missed call history;

d.  Outgoing text messages;

e.  Incoming text messages;

f.  Draft text messages;

g.  Telephone book;

h.  Data screen or file identifying the telephone number associated with the mobile telephone  searched;

i.  Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched;

j.  Voicemail;

k.  User-entered messages (such as to-do lists);

l.  Browser messages and/or internet communications (*e.g.*, e-mail; text messages) both to and from the cellular telephone (including any in draft form) relating to or referencing narcotics trafficking or money laundering or individuals engaged in narcotics trafficking or money laundering;

m.  Photographs; and

n.  Any passwords used to access the electronic data described above.

2